UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,

v.

BRYAN ALAN KENNERT,

              Defendant.

_____/

No. 1:22-CR-36

HON. HALA Y. JARBOU
Chief United States District Judge

## UNITED STATES' SENTENCING MEMORANDUM

Kennert raises three objections, each of which goes to the loss amount as calculated by the presentence report. First, he argues he should not be held responsible for the anticipated loss because that term in the Guideline commentary is an improper expansion of the text. But the commentary's definition of intended loss is an appropriate definition of the term loss as used in the Guideline, and the Sixth Circuit held as much.

Second, Kennert argues he intended to hold onto the fake cards and packs recovered from his home, so they should not be considered in the intended loss calculation. But Kennert's claim is not believable; his career has revolved around selling fake cards and card packs.

Third, Kennert argues the dollar amount attributed to the fake cards and card packs is speculative and unreasonable, but the amount is conservative. To arrive at the loss amount, a baseball card expert analyzed them to determine their value. The presentence writer then discounted the cards to hold Kennert accountable for only 25%

of their market value—about the amount Kennert discounted other cards he recently sold.

The Court should apply the loss amount recommended in the presentence report because it is a reasonable and conservative estimate of the loss Kennert intended to inflict, precisely what the Guidelines call for.

## RESPONSE TO OBJECTIONS

U.S.S.G. § 2B1.1(b)(1) establishes Guideline enhancements in fraud cases based on the loss amount. Application Note 3 defines "loss" to include the "intended loss," which is "the pecuniary harm that the defendant purposely sought to inflict," including "pecuniary harm that would have been impossible or unlikely to occur." *Id.* at Cmt. 3(A)(ii). "The intended loss necessarily includes all actual losses, because actual loss is merely a loss [the defendant] intended to inflict and did inflict." *United States v. Tate*, 136 F. App'x 821, 826 (6th Cir. 2005). The Guidelines further instruct the "court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1(b)(1), cmt. 3(C). Indeed, when a defendant engages in a scheme and is caught with the kind of property used in the scheme, it is "reasonable to infer that the [defendant] intended to continue, and would have continued [the scheme] in the same manner if [he] had not been apprehended." *United States v. Tate*, 136 F. App'x 821, 826 (6th Cir. 2005) (collecting authority from other circuits).

I. **The Sixth Circuit previously held the term intended loss in the Guideline commentary is a proper interpretation of the term loss in the Guideline's text.**

After the final presentence report was filed, Kennert notified the probation officer and the Government of this additional objection via email:

> The defense objected to the use of intended loss to increase the guideline range. I am writing to provide additional case law support for that position. This commentary was an improper attempt by the Commission to publish a substantive rule in the commentary. *United States v. Riccardi*, 989 F.3d 476, 484–85 (6th Cir. 2021), *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019).

This argument is premised on the holding in *United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019) (en banc). In *Havis*, the Sixth Circuit held Guideline commentary cannot define a term in a way that is inconsistent with the text of the Guideline itself. *Id.* ("Commentary binds courts only 'if the guideline which the commentary interprets will bear the construction. Thus, we need not accept an interpretation that is 'plainly erroneous or inconsistent with the 'corresponding guideline'") (quoting *Stinson v. United States*, 508 U.S. 36, 45 (1993)). In other words, Kennert is arguing the term loss in the Guideline text is inconsistent with the concept of including the intended loss.

In *United States v. Murphy*, 815 F. App'x 918, 924 (6th Cir. 2020), the Sixth Circuit held "[t]he commentary defining 'loss' is consistent with the construction of the Guidelines as an interpretation of, rather than an addition to, § 2B1.1(b)." Accordingly, the Sixth Circuit has "consistently applied the commentary on 'intended loss' when calculating the Guidelines range." Indeed, the term "loss" in § 2B1.1(b) applies primarily to cases involving financial or economic crimes, which would encompass the intended loss. An economic loss includes "[a] monetary loss such as … lost profits." ECONOMIC

LOSS, Black's Law Dictionary (11th ed. 2019); *see also United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2021) ("the 'diminution of one's possessions or advantages'") (quoting 9 *Oxford English Dictionary* 37 (2d ed. 1989)). Here, Kennert's lost profits are primarily the loss he suffers by being caught committing wire fraud. But for the intervention of law enforcement, he would have sold the fraudulent cards found at his home. Because he was caught, he cannot.

Kennert may argue that *Riccardi* calls *Murphy* into question, but the *Riccardi* court explicitly avoided disturbing the holding in *Murphy*. In *Riccardi*, the Sixth Circuit held the term loss in the Guideline's text does not support Commentary providing that "[i]n a case involving any ... unauthorized access device, loss includes any unauthorized charges made with the ... unauthorized access device and shall be not less than $500 per access device." *Riccardi*, 989 F.3d at 482 (quoting U.S.S.G. § 2B1.1 cmt. 3(F)(i)). That holding says nothing about whether the term loss in an economic context would include intended losses. Indeed, the Sixth Circuit was careful to distinguish *Murphy* and explicitly did not address the intended loss question. *United States v. Riccardi*, 989 F.3d 476, 488 (6th Cir. 2021) ("[W]hether 'loss' in § 2B1.1 can be read to include intended loss says nothing about whether it also can be read to mean an automatic $500 loss amount for all stolen gift cards no matter the facts. Nothing in *Murphy* implies that § 2B1.l can be read in that broader way.").

-4-

## II.  Kennert's career has revolved around selling stolen cards and packs; the ones he had at home are properly included in the intended loss amount.

Kennert claims he "bought the cards taken from his home for his own personal collection," (R.26: Def. PSR Rsp., PageID.82,) but his claim is contradicted by the facts of this case. First, the cards are worthless because they are fakes, and Kennert has provided nothing in support of the claim that he wanted to hold onto worthless mementos.

Second, Kennert's offense here was not a one-off occurrence; he has made a career of selling fake cards. Indeed, Kennert sold fake cards at least as early as 1992, after learning a friend's father owned a printing business in Hong Kong. (R.31: PSR, PageID.115.) At that time, Kennert sold 1,000 copies of a fake card, and he had between 4,000 and 5,000 more at his home when police searched it. (*Id.*)

Finally, Kennert admitted he planned to sell the cards and sports memorabilia that were at his home. Indeed, Kennert told the victims of his crime that they could buy more cards from him or at his upcoming estate sale:



(Left: Kennert. Right: Victim of Offense)

Kennert similarly told police executing the search warrant in this case he intended to sell everything in his house at an upcoming estate sale.

Kennert cites to *United States v. Kirschner*, 995 F.3d 327 (3d Cir. 2021), to argue he did not intend to cause a loss based on those cards at his residence. In *Kirschner*, the defendant sold counterfeit coins and bullion. *Id.* at 331. Police searched his home and discovered more counterfeits that would have been worth $46.5 million if they were real. *Id.* at 331-32. The district court determined the intended loss was 77% of the market value, given the price for which the defendant historically sold his coins. The Third Circuit found clear error in the loss amount, arguing the Government failed to engage in what it called a "deeper analysis" to show *Kirschner* intended to sell the coins found at his home for similar prices. *Id.* at 338.

Kennert's reliance on *Kirschner* is misplaced for a host of reasons. First, this is a non-binding Third Circuit case, and the Sixth Circuit has not called for the "deeper analysis" called for by the Third Circuit. Second, the "deeper analysis" standard seems to conflict with the commentary to the Guidelines themselves. Indeed, the Guidelines instruct that the intended loss includes losses that "would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1(b)(1), cmt. 3(A)(ii). Third, the deeper analysis standard seems to conflict with the standard employed to determine intended loss as endorsed by the Sixth Circuit. *United States v. Thomas*, 841 F. App'x. 934, 937 (6th Cir. Jan. 26, 2021) ("Because of the difficulties often associated with attempting to calculate loss in a fraud case, the district court 'need only make a reasonable estimate' of the loss using a preponderance of the evidence standard.") (quoting *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013)). Indeed, no other circuit appears to have adopted the "deeper analysis" standard used in the Third Circuit.

Finally, the facts of Kennert's case satisfy the Third Circuit's "deeper analysis," regardless. There, the defendant advertised fake coins on Facebook and sold them in grocery-store parking lots and local bank lobbies for about $100 per coin. *Kirschner*, 995 F.3d at 336. Given that, the Third Circuit found it was "not clear whether Kirschner intended to evolve his operation to attempt the type of rarefied sales contemplated by the government's loss figures." *Id.* Kennert had already evolved his operation by the time police searched his home. He has been selling fake cards and card packs since 1992, and he sold over 1,000 fake cards then. (R.31: PSR, PageID.115.) Recently, he advertised and sold his cards on eBay and at an antique market. (*Id.* at PageID.109.) Indeed, during his

interview by police, Kennert admitted selling fake cards on eBay and making between $500.00 and $1,000 per week on cards there. (*Id.*) And he sold cards through the antique market in transactions ranging from $31.80 to $14,840. (*Id.* at PageID.108.) Simply put, the "deeper analysis" called for by the Third Circuit confirms Kennert intended to, and had the ability to, sell the fake cards in his possession for 25% of their market value.

### III.  The loss amount here is conservative and reasonable.

Kennert also raises two challenges to dollar value assigned to the fake cards and packs seized from his residence. First, he argues the value placed on the cards is unreasonable, primarily arguing the prices are speculative and too high. Second, he contends the presentence report's proposed discount rate, valuing the cards at 25% of their market value, is unreasonable.

The values assigned to the fake cards at Kennert's home are conservative, and the Government will call an expert at sentencing to explain his valuation. After receiving the fake cards, the Government submitted them to Phil Endris from the Baseball Card Exchange. (R.31: PSR, PageID.108.) "Baseball Card Exchange is recognized as the industry leader in unopened vintage sports cards." Our Story, https://www.bbcexchange.com/about-us (Aug. 23, 2022). Mr. Endris has worked at Baseball Card Exchange for about five years. To value cards, he compares those cards to recent, confirmed sales from multiple top auction houses of like-condition cards. In preparing his initial valuation report, Mr. Endris conducted a quick analysis and provided conservative values to the cards and packs at Kennert's home. That analysis led to an estimated value of $4,355,400 if the cards had been authentic, which is the number used

in the presentence report. (Ex. 2: Initial Valuation Rpt.) In preparation for his testimony at sentencing, Mr. Endris conducted a more thorough review the fake cards and packs, finding comparable recent sales. That analysis led to a valuation of $7,326,212 for the fake cards and packs. (Ex. 3: Final Valuation Rpt.) While the subsequent valuation would place Mr. Kennert in a higher category under U.S.S.G. § 2B1.1(b)(1), the Government recommends the Court employ the initial valuation because Mr. Kennert had that valuation when he pled guilty.

The cards were also discounted by a significant amount to arrive at the proposed loss amount, which is also conservative. The presentence report recommends discounting the fake cards and packs to 25% of their market value to determine the intended loss. (R.31: PSR, PageID.109.) The amount is conservative when looking at Kennert's history selling fake cards and card packs. The following chart represents the amount Kennert has historically received for fake cards:

| Card(s) | Market Price | Kennert Price | Kennert % Market Price |
|---|---|---|---|
| This Case | $200,000 | $43,354.94 | 21% |
| Will Clark[1] | $28 | $12 | 42% |
| Wade Boggs | $40 | $22 | 55% |
| Daryl Strawberry | $70 | $37 | 52% |
| Roger Clemens | $50 | $25 | 50% |
| Cal Ripken | $25 | $12 | 48% |
| AVERAGE | | | **44%** |

As shown above, Kennert has sold fraudulent cards and packs for 44% of their market value, so if anything, the 25% rate is conservative given Kennert's past actions. This estimate is in line with the estimate used in the *Kirschner* case that Kennert heralds; there the district court adopted, and the Third Circuit did not object to, using 77% as the percent the defendant received of the market price because that is about how much he typically received for the fake coins. More importantly here, the 25% figure recommended in the presentence report provides "a reasonable estimate' of the loss using a preponderance of the evidence standard." *Thomas*, 841 F. App'x. at 937.

---

[1] These prices are taken from page 6 of Kennert's 1992 presentence report, which is attached as Exhibit 1.

## <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully requests the Court overrule Kennert's objections at sentencing and use the Guideline calculation recommended in the presentence report.

Date: September 13, 2022            Respectfully Submitted,

MARK A. TOTTEN
United States Attorney


/s/ Davin M. Reust
DAVIN M. REUST
Assistant United States Attorney
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404