UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————

UNITED STATES OF AMERICA,

              Plaintiff,

v.

BRYAN ALAN KENNERT,

              Defendant.

————————————————————/

Case No. 1:22-cr-36

Hon. Hala Y. Jarbou
Chief United States District Judge

**DEFENDANT'S SENTENCING MEMORANDUM AND
BRIEF IN SUPPORT OF MOTION FOR DOWNWARD VARIANCE**

Bryan Alan Kennert will appear for sentencing before this Honorable Court on September 20, 2022, at 10:00 a.m. A Presentence Investigation Report ("PSR") has been prepared and disclosed to both parties. (ECF No. 26, PSR.) Counsel has had an opportunity to review the PSR with Mr. Kennert.

The defense objects to the scoring of the offense level—specifically, the use of a fictional intended "loss" amount to enhance the base offense level by 14 levels is contrary to law and also unsupported by the facts. If the objection is sustained, then the base offense level would be 7, with an increase of 6 levels for a loss amount of $43,354.94, producing a guideline range of 8 to 14 months.

Mr. Kennert respectfully submits this sentencing memorandum, which also includes a request for a downward variance, to assist the Court in fashioning an appropriate sentence.

# I.     Nature and Circumstances of the Offense

For many years, Mr. Kennert worked with his widowed mother in the antiques business, while they lived together in his childhood home. In 2018, she passed away, and Mr. Kennert inherited the house, as well as the personal effects and belongings of her and his family from the past several decades. Mr. Kennert located and hired a professional estate service to help him organize and manage his mother's estate after her death.

Around this time, Mr. Kennert also rented a small amount of space, or a "booth," in an antiques warehouse in Muskegon, Michigan. He did not always staff the booth, so in his absence, interested customers might reach out to him. In April 2019, he was contacted by Andrew "Andy" Frisinger, aged approximately 41, and his wife. Mr. Frisinger was interested in getting a good deal on rare baseball cards.

Over the phone and via text message, Mr. Frisinger discussed with Mr. Kennert a purchase of baseball cards. Ostensibly believing he was getting a really good deal on some very valuable cards, Mr. Frisinger purchased some packs of baseball cards from Mr. Kennert. The report of investigation prepared by the Department of Homeland Security, disclosed in discovery in this case, states that Mr. Frisinger had engaged in independent research and determined that Mr. Kennert's suggested sale price was a great deal less than the actual value of the items. In total he made $43,354.94 in purchases from Mr. Kennert using the online payment system Square.

In May 2019, Mr. Frisinger submitted items to a professional card grader, who,

in approximately February of 2020, informed him that packs he had purchased were not authentic. Upon hearing this, Mr. Frisinger did not call Mr. Kennert to discuss what he had been told, or to demand his money back for those items. Instead, he called upon the federal law enforcement authorities to avenge his deal.

Meanwhile, agents from the Department of Homeland Security had begun to engage in a clandestine investigation of Mr. Kennert. They started live surveillance on his residence in Muskegon. Agents also affixed a GPS tracker on his car in June 2021, tracking his every movement. They watched his weekly comings and goings, even when he went to his doctor's office.

On June 18, 2021, Mr. Frisinger reached out to Mr. Kennert again. He feigned friendliness and concern about his health. He did not mention that he had any concerns or questions about the prior purchases. In fact, he asked Mr. Kennert about more, but Mr. Kennert did not sell him any. Mr. Kennert expressed he had suffered a stroke and he contracted covid in the hospital. He explained what he was going through with regard to managing his mother's passing and that he hired a professional estate company to sell some of the stuff he had. He indicated that he just wanted to simplify his life.

On July 9, 2021, Homeland Security agents appeared at Mr. Kennert's home with a search warrant. The place was stuffed with the personal belongings of Mr. Kennert, his late mother and father, and the rest of their family, including items like clothes, jewelry, dishes, comic books, personal financial records, veterinarian records, Operation Desert Storm collectibles, sports memorabilia like cards, pennants, and

baseballs, hunting gear, and old electronics like computers and phones.

While the warrant was being executed, Mr. Kennert voluntarily sat down to speak with agents. The agents explained they were executing a warrant for "counterfeit baseball cards." Mr. Kennert explained that he had been convicted of that offense several years ago, when his roommate's father in China printed fake cards. He explained to agents that he had obtained cards from China, a man named Todd Bine, or on eBay. He could not remember details very well, noting "it had been a long time." Mr. Kennert explained that it is often hard for him to tell if items were real or fake but that some of the items he received were real, while others were resealed. He stated that he had sole both real and counterfeit cards.

Mr. Kennert acknowledged he felt very sorry about his past mistakes. He explained that around the time his mother passed away, he decided to stop engaging in illegal activity. He had a morale change, and he burned most of the counterfeit items from China. He was in bad physical shape, and owed rent on the booth. He closed down his booth when the owner of the antiques mall offered to let him pay off his lease if they kept his inventory. He explained that hired a professional estate reseller to handle getting rid of all the various items in the home. When asked, he remembered the Frisingers specifically, noting his wife was a doctor. Mr. Kennert stated that Mr. Frisinger bought several items from him, and that while some of the packs were authentic, some were resealed.

On March 6, 2022, a felony Indictment charging eight counts of wire fraud was filed in the United States District Court for the Western District of Michigan,

Southern Division. Mr. Kennert was informed of the charges and he voluntarily surrendered. He was released on bond.

On July 8, 2022, Mr. Kennert pleaded guilty to knowingly selling resealed packs to Mr. Frisinger. He started job seeking and continued attending to his health, with the assistance of his former wife. He has violated no bond conditions.

## II.    History and Characteristics of Mr. Kennert

Mr. Kennert is 57 years old. He was born and raised in the Muskegon, Michigan, area. His father, James Kennert, and his mother, Gloria Kennert, were married for 40 years before they passed away. He has two brothers—Michael, who works in furniture industry, and Paul, who is disabled. Mr. Kennert was very close with his parents.

In 1982, Mr. Kennert was committed to a hospital following an emotional breakdown. He lived in group homes for a time when he was a teenager. However, he worked diligently to get his young life together, and he graduated high school in 1983. He served in the Michigan National Guard, and he later enrolled at Oakland University.

Mr. Kennert's college roommate was from Hong Kong. He introduced Mr. Kennert to his own father, who had a printshop in China. His roommate's father printed some counterfeit baseball cards and gave them to Mr. Kennert, who sold them in the United States. In 1987, Mr. Kennert was convicted of mail fraud relating to their sale.

When he was arrested, his parents were disappointed, but they did their best

to support him. They worked closely with the U.S. Probation Office to ensure he received the mental health services and other support that he needed while on supervision. Sadly, Mr. Kennert's father passed away in 1997, the same year Mr. Kennert was released from supervision, so he returned to Muskegon to help his mother.

Once both were back on their feet, Mr. Kennert moved to Chicago for a fresh start. During that time, Mr. Kennert explains, he provided meaningful assistance to the federal government. Specifically, at the request of the FBI and the Postal Inspector, he wore a wire to assist with the federal investigation of Louis Burdi. (Undersigned counsel confirmed that Mr. Burdi has a prior conviction in federal court of trafficking in counterfeit devices.)

A short time later, Mr. Kennert offered a job in manufacturing in China. He moved abroad and started working as a supervisor in a toy factory. He was absolutely thrilled to be able to build a life there. He felt respected and satisfied after a long day's work. Soon, he met a woman and they fell in love. At one point, he indicates, a representative of an intelligence agency of the U.S. Government approached him. The individual requested that he help serve his country by bringing electronic materials from China across the border.

Tragically, Mr. Kennert's joy was cut short when his love was killed in a car accident. Bereft, he moved back to the United States and lived with his mother. He began helping her with her business and assisting her with her daily needs. When she finally passed on, he inherited the family home, where he still lives. Mr. Kennert

hired a professional estate sale company to sell off some of the family's belongings, and he received well over $12,000 from the sale. His nephew also lived with him and paid him $500 per month in rent.

### III.     Objection to Scoring of Offense Level

Mr. Kennert objects to the use of "intended loss" to drastically increase his guideline range. The sale price, $43,354.94, is the proper measure of loss, such that the increase in the offense level is 6 levels, not 14, under U.S.S.G. § 2B1.1(b)(1)(D).

### A.  *The Commentary relied upon for the scoring in the PSR unlawfully expands the Guideline language to include fictitious intended loss*

The relevant guideline—U.S.S.G. § 2B1.1—scores a defendant based on the **actual** loss caused by their offense. Only the commentary to the guidelines permits using **intended** loss rather than actual loss. As explained below, the commentary cannot expand the scope of the guideline in this way.

Respectfully, as a threshold matter, the government's claim that the defense filed this objection after the Final PSR was filed is untrue. (See ECF No. 39, PageID.155.) On August 31, 2022 (the day before the final PSR was filed), defense counsel sent an email to the PSR writer, copying the government, citing additional case law in support of her previously filed objection to the PSR's use of intended loss. In her correspondence, defense counsel specifically inquired whether the PSR writer preferred instead that she file a supplement. In response, the PSR writer advised her there was no need to do so, and to include it in her sentencing memorandum instead.[1]

---

[1] Defense counsel will bring copies of this email exchange to the sentencing hearing to furnish them to the Court if necessary. As noted, the government was copied on this original exchange.

With regard to the substantive objection, "the guidelines are the equivalent of legislative rules adopted by federal agencies." *Stinson v. United States*, 508 U.S. 36, 45 (1993). Similarly, the commentary to the guidelines "is akin to an agency's interpretation of its own legislative rules." *Id.* Accordingly, courts apply administrative law principles to interpret the guidelines. *United States v. Riccardi*, 989 F.3d 476, 484–85 (6th Cir. 2021). Thus, in *Stinson*, the Supreme Court "found that the commentary deserved the deference given to an agency's interpretation of its regulations—what was then known as *Seminole Rock* deference but now goes by *Auer* deference." *Riccardi*, 989 F.3d at 484 (citing *Stinson* 508 U.S. at 45).

"Applying *Auer*'s test, *Stinson* held that the commentary's interpretation of a guideline 'must be given "controlling weight unless it is plainly erroneous or inconsistent with the" guideline.'" *Riccardi*, 989 F.3d at 484 (quoting *Stinson*, 508 U.S. at 38). This "plain-error test seemed to require courts to give great deference to the commentary." *Id.*

However, the Supreme Court recently "further develop[ed]" the *Auer* doctrine and emphasized its "cabined" scope. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019).

> *Kisor* acknowledged that the Court's "classic" plain-error phrasing of *Auer*'s test "suggest[ed] a caricature of the doctrine, in which deference is 'reflexive.'" *Id.* at 2415 (citation omitted). Yet *Kisor* cautioned that a court should not reflexively defer to an agency's interpretation. Before doing so, a court must find that the regulation is "genuinely ambiguous, even after [the] court has resorted to all the standard tools of interpretation" to eliminate that ambiguity. *Id.* at 2414. The agency's interpretation also "must come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2416.

*Riccardi*, 989 F.3d at 485.

*Kisor*'s limits to *Auer* deference apply in the context of the sentencing guidelines and commentary. *Riccardi*, 989 F.3d at 485. Accordingly, the Court cannot "immediately defer to [the] Application Note[s]." *Id.* at 486. Instead, the Court must "first ask whether § 2B1.1 is 'genuinely ambiguous.'" *Id.* (quoting *Kisor*, 139 S. Ct. at 2415).

Here, § 2B1.1 is not ambiguous. Under § 2B1.1(b)(1), the defendant's offense level increases depending on the amount of loss. The guideline does not define loss. "Where, as here, a legal text does not define a term, we generally 'give the term its ordinary meaning.'" *Riccardi*, 989 F.3d at 486 (quoting *United States v. Zabawa*, 719 F.3d 555, 559 (6th Cir. 2013)). Accordingly, the Sixth Circuit has looked to dictionaries to define the word "loss":

> One dictionary defines the word to mean, among other things, the "amount of something lost" or the "harm or suffering caused by losing or being lost." *American Heritage Dictionary of the English Language* 1063 (3d ed. 1992). Another says it can mean "the damage, trouble, disadvantage, [or] deprivation ... caused by losing something" or "the person, thing, or amount lost." *Webster's New World College Dictionary* 799 (3d ed. 1996). A third defines it as "the being deprived of, or the failure to keep (a possession, appurtenance, right, quality, faculty, or the like)," the "[d]imunition of one's possessions or advantages," or the "detriment or disadvantage involved in being deprived of something[.]" 9 *Oxford English Dictionary* 37 (2d ed. 1989).

*Riccardi*, 989 F.3d at 486.

One thing that all these definitions share is that a focus on result, not intent. Thus, "loss" ordinarily means only actual loss, not intended loss. "There is no reasonable construction of the 'plain and ordinary meaning' of loss that includes harm that did not actually materialize." *United States v. Alford*, No. 3:21CR052/MCR, 2022

WL 3577373, at *3 (N.D. Fla. Aug. 20, 2022), *vacated as moot*, ECF No. 56, Order, (Aug. 22, 2022). Accordingly, "[o]nly this comment [U.S.S.G. § 2B1.1 cmt. n.3(A)(ii)], not the Guidelines' text, says that defendants can be sentenced based on the losses they intended." *United States v. Kirschner*, 995 F.3d 327, 333 (3d Cir. 2021).

Thus, by increasing a defendant's sentence based on intended loss, the Sentencing Commission improperly attempted to publish a substantive rule in the commentary. "[I]f the Commission seeks to keep individuals behind bars for longer periods of time based on this type of 'fictional' loss amount, this substantive policy decision belongs in the guidelines, not in the commentary." *Riccardi*, 989 F.3d at 487. The Commission cannot skirt the procedural requirements of administrative law by publishing substantive rules in the commentary rather than the text of the guidelines. *Riccardi*, 989 F.3d at 485. Accordingly, the Court should follow the text of the guidelines, and increase Mr. Kennert's sentence only based on actual loss.

The Sixth Circuit has previously rejected this argument in an unpublished opinion. *United States v. Murphy*, 815 F. App'x 918, 924–25 (6th Cir. 2020). However, the Sixth Circuit later pointed out—in a published opinion—that "*Murphy* did not address *Kisor*'s recent clarification about the limited nature of *Auer*." Instead, *Murphy* applied the now outdated version of that doctrine used in *Stinson*. *Murphy*, 815 F. App'x at 924–25. Accordingly, *Murphy* is both non-binding and unpersuasive. This Court should follow the Sixth Circuit's precedential opinion in *Riccardi*, applying *Kisor*'s standard to the guideline's commentary.

The opinion in *United States v. Alford*, 2022 WL 3577373 (N.D. Florida, August

20, 2022), issued just last month by the Northern District of Florida, is instructive. The defendant objected to the loss amount in the PSR, which was "calculated from an alleged 'intended' loss Alford sought to inflict, rather than any loss actually sustained by the victim." In sustaining the defendant's objection, the court reviewed the applicable case law, including but not limited to *Kisor*, *Auer*, and *Riccardi*, and also consulted multiple dictionary definitions. *Id.* The court observed that those definitions "show that 'loss' can mean different things in different contexts," and "can encompass economic, emotional, and/or physical harms." *Id.* However, the court observed, all of the definitions of loss in *all* of its various contexts share "one element" – that is, "concrete materialization of harm." *Id.* The court held that the term "loss" is unambiguous in one respect: that is, "***[t]here is no reasonable construction of the 'plain and ordinary meaning' of loss that includes harm that did not actually materialize.*"** *Id.* (emphasis added), citing *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011).

   B. *The intended loss amount upon which the offense level should be calculated is $43,354.94, the actual loss*

Even if this Court deferred to the guidelines' commentary, here the "intended loss" is still $43,354.94. The government must prove that defendant subjectively intended to cause the loss amount. *United States v. Nelson*, 732 F.3d 504, 520 (5th Cir. 2013). What Mr. Frisinger bought was a negotiated, agreed-upon amount between him and Mr. Kennert. This figure is both the actual loss to the buyer, and the intended loss.

The government claims "but for" the heroic intervention of law enforcement,

11

Mr. Kennert would have fraudulently sold all the items in his house. This is false. First, contrary to the government's assertion in its motion for forfeiture, Mr. Kennert's "career" is not selling "fake cards." He is college educated and he has a legitimate employment history. He was gainfully employed in China for many years. More recently he worked for his mother, an antiques dealer in the United States. He also received financial support for helping care for her as her health deteriorated. After she passed on four years ago, Mr. Kennert received the family home, as well as income from the proceeds from the sale of her estate—a sale which was professionally administered by third parties. Finally, Mr. Kennert has received income from the rent paid by his nephew over the past several years.

The items in the home are not "worthless," as the government claims. First, the DHS agent informed undersigned counsel that (1) it seeks to return several boxes of items it took, and (2) a great deal of the baseball cards they took were, in fact, authentic. Second, even if these items have limited market resale value, they are no more "worthless" than, for example, a reprinted Van Gogh poster from a museum gift shop. A knock-off item still has value to the purchaser. This may be its actual purchase value, or something more intangible or sentimental, like memories associated with the museum visit, or its aesthetic value to the beholder.

Mr. Kennert has been a collector of memorabilia, both authentic and knock-off, his entire life. He collects actual baseballs and pennants, cards from wars, cards from baseball, cards from hockey, etc. Moreover, he is 57 years old and living in his childhood family home. The house is stuffed to the gills with memories and material

that has been accumulating for decades by five different members of his family during their lifetimes. To a single man who grew up with two brothers and a father who also were sports fans, and whose late mother was an antiques dealer, all of these mementoes had a great deal of value.

Following his stroke, and in a state of grief from his mother's passing, Mr. Kennert thought he might get rid of these items one day. However, he did not. And the government has not demonstrated that he offered any of them specifically for sale on misleading terms. *See United States v. Kirschner*, 995 F.3d 327, 335 (3d Cir. 2021) (holding that the government did not prove that the defendant intended to sell rare coins at their market value).

The government claims that Mr. Kennert tried to fraudulently sell more packs to Mr. Frisinger. However, the government's incomplete version of the text message conversation is misleading to the Court. A more complete version of the conversation, which was disclosed in discovery, is set forth below, and shows that Mr. Kennert did not intend to commit any fraudulent act in that conversation.



**People going crazy**

Mar 17, 2020, 6:28 PM

**Are you okay**

Today 2:18 PM

BRIANnnnn. Whats up man, i was driving by anything and everything a couple days ago and thought of you. Wondering if your e doing ok. Weve been through a shit show last year. This is your baseball card friend andy in case im not logged in your phone. Also wanted to know if you found anymore packs? Just checking.

Sent as Text Message

Text Message
Today 6:17 PM

I texted you about a year ago twice and didn't get an an answer I thought something bad happened thank goodness, maybe we missed each other I sold everything there but i still have a bunch of packs, of course it was a bad last year

Did you get the art deal with topps?



Brian, Anything Everything. ›

Hey hey. No, I never got it but Ive been thinking of maybe sending stuff to upper deck. I see art stuff from them sometimes.
Im sorry i missed that text. I literally haven't been able to ho anywhere this whole time. I don't know if you remember mary had that bike accident. She had some set backs that required 2 major surgeries with a third coming. They have to ho through her eye so I cant risk giving her anything and having that area get infected.
Have you been doing good? I miss the store hangs. Thats so cool you have some packs. Yesterday I was looking for pack displays like we



Brian, Anything Everything. ›

that area get infected.
Have you been doing good? I miss the store hangs. Thats so cool you have some packs. Yesterday I was looking for pack displays like we talked about. I might have to build one though, they only make displays for cards. No hurry but if its cool could you send me a couple pics of what you have, at your convenience. Shit , sorry long text.

Sent as Text Message

Text Message

It's okay we both fell off I'm having an estate sale next month and was going to sell a lot of my cards and memorabilia if your interested



Several features of this conversation undercut the government's assertion. First, this text conversation overall was **_initiated by Mr. Frisinger, not Mr. Kennert._** And it was not Mr. Kennert who first raised the subject of buying packs; Mr. Frisinger specifically asked him if he had any. Moreover, in response, Mr. Kennert explains to Mr. Frisinger that he is going to have an estate sale that a professional, and not Mr. Kennert, would handle. Mr. Kennert also specifically mentions that he also has photographs and pennants he is seeking to unload— critically, these are not counterfeit.

In short, Mr. Kennert's statements in response to Mr. Frisinger's specific inquiry about packs contain absolutely no indication that he intended to sell anything

on fraudulent terms. Curiously, Mr. Frisinger's comments about him sending materials to Upper Deck and striking a deal with Topps (two prominent baseball card manufacturers), indicate that Mr. Frisinger actually is quite plugged in with other professionals in the industry, and therefore, a more sophisticated card collector than average Joe off the street.

Finally, the timing of this conversation is important, as it was initiated by Mr. Frisinger **after** he had contacted law enforcement about Mr. Kennert. In short, the attempt to "set up" Mr. Kennert to make fraudulent sales did not work—Mr. Kennert did not intend to, attempt to, or actually complete any such sale. For these reasons, this conversation is an improper attempt to inflate a guidelines calculation.

C. *The loss amount claimed by the government is speculative and not supported by a preponderance of the evidence*

Both the claimed total valuation, as well as the unique method the PSR used to calculate the loss, based on formula assessing the counterfeit cards at 25 percent of their claimed value, are impermissibly speculative and not supported by the weight of the evidence. *United States v. Nelson*, 732 F.3d 504, 520 (5th Cir. 2013).

Michael Osacky is a Lead Appraiser for Professional Sports Authenticators (PSA), a USPAP Compliant Appraiser of Vintage Sports Cards & Memorabilia, and an Accredited Member of the International Society of Appraisers (ISA).[2] On request of the defense, Mr. Osacky reviewed the relevant information in this case. To assist the Court in this matter, he prepared the attached letter explaining how a sports card

---

[2]   See   www.isa-appraisers.org/find-an-appraiser/profile/11246/michael-s-osacky,   last   accessed September 13, 2022.

is assigned value. (Attachment 1, Letter from Michael Osacky.)

Mr. Osacky explains the importance of the "grading" process in determining valuation. Namely, grading a card (i.e., assigning a numerical figure to its condition) helps to reconcile disparate values that may be assigned to an item.

That said, a card does not have to be graded to have value; value is assigned to ungraded collections as well. As Mr. Osacky explains:

> To estimate values for these cards, I would have to look for comps of a similar card but different player. Depending on what I am looking at, not each card needs to be reviewed. For example, a 1990 Score baseball card set has 704 cards. A factory sealed set might be $10. Therefore, it's not worth my time to review each card.
>
> Finally, the values assigned to a card differ based on the objective. If a card is being appraised for donation purposes, the appraiser must use FMV. (Fair Market Value.) FMV is the current market value. (What the card sold for recently.) If a card is being appraised for insurance purposes, the appraiser uses RRV (Retail Replacement Value). RRV slightly inflates the values in today's market because we don't know at what point in the future a claim will be made with the insurance company. A hurricane could hit tomorrow, or somebody breaks into your home next year and steals your trading cards. When the insurance company replaces the card, they typically cut a check and don't actually purchase the exact card that was damaged or stolen. Therefore, they look at what is being asked on the open market (and not recently sold).

(Attachment 1, Letter from Michael Osacky.)

Here, Mr. Endris' first letter made absolutely no reference to **_any_** sort of metric for assigning valuation—that is, it did not indicate the value for any of the listed cards if graded, and at which grade and condition. Nor did he list comparable sales figures and dates. In fact, in some places, Mr. Endris did not even state the specific

number of cards—he just said "several." Without this information, his estimates on values could not be verified. The 25% method used by the PSR adds yet another layer of speculation and arbitrariness. These failings were set forth in the defense's written objections.

Just yesterday, the government disclosed an amended letter by Mr. Endris, which it has attached to its sentencing memorandum. But these claimed values also are not a proper basis for determining "loss" in this case. For example, the letter sets forth values for cards that are graded a 7, an 8, or a 9. According to Mr. Osacky, who reviewed Mr. Endris' second letter, these are extremely high-level grades and therefore very rare. The cards taken by the government here were not graded—they were counterfeit. There are no facts set forth that support the contention that a reasonable buyer, let alone a sophisticated buyer like Mr. Frisinger who did his own research and was familiar with the field, would believe that any of these items would be viewed as graded as a 7, 8, or 9. For his part, Mr. Kennert certainly did not represent these items as graded, let alone graded at a certain level such that they would be perceived as worth these amounts.

Finally, the cards cited in Mr. Endris' rehabilitated letter list sale prices—in other words, these are aspirational prices; they are not completed sales such that they can establish fair market value.

## IV.     Request for Downward Variance under 18 U.S.C. § 3553(a)

Mr. Kennert respectfully submits that a downward variance is appropriate here because of his health and the need to provide restitution.

Mr. Kennert acknowledges that the seriousness of his offense lies in the fact that he "broke someone's trust." (Attachment 2, Allocution Letter.) The naïve and ambitious mistake that he made as a young man, which led to his felony conviction, has haunted him his entire life. He has experienced a great deal of rejection in the workplace in the United States, which ultimately led him to employment in China. He very much enjoyed his life and work in China. As he explains, "it was based on my skill not my past." Mr. Kennert's own written sentiments reveal how ashamed he is to find himself in this position, and how he wishes he could just get a good job. (Attachment 2, Allocution Letter.)

When Mr. Kennert's partner died suddenly and tragically in China, he came home. He moved back to the United States, into his childhood home with his aging mother, a widow who lived alone. He worked for her, he cared for her, and he spent nearly every day with her. When she became sick with dementia, it was very difficult for him to watch. Despite witnessing her decline, he was unprepared for her death. At the time Mr. Frisingers contacted Mr. Kennert in 2019, it was shortly after her death, and he was struggling to manage the cost of her funeral and maintaining the home while coping with his grief. He was distraught, disorganized, and in despair. In that frame of mind, he committed the instant offense conduct, something that he deeply regrets.

Mr. Kennert has struggled with both mental and physical health problems for many years. He was hospitalized for mental health issues as a teenager and has been diagnosed with depression. He has a history of stroke, chronic kidney disease,

diabetes, and lymphedema.[3] He is prescribed a host of medications and his doctor has ordered him to receive dialysis treatment. His ex-wife now resides with him to ensure he takes his medication and does not have a household accident due to his limited mobility and his forgetfulness.

A high proportion of stroke survivors had met the DSM IV cognitive impairment within 3 months after stroke.[4] Although the prevalence of post-stroke cognitive impairment is very high according to the present data, evidence shows that the present criteria may underestimate the frequency of dementia and the cognitive decline in stroke survivors.[5] Additionally, vascular risk factors such as hypertension, diabetes mellitus, hyperlipidemia, smoking, atrial fibrillation, and smoking increase the risk of both cognitive impairment and Alzheimer's Disease when coupled with stroke.[6] And in the case of a stroke, one or more cognitive domains may be affected, including attention, memory, language, and orientation.[7]

It appears that Mr. Kennert is already struggling in these domains, as he is no

---

[3] The final PSR does not list Mr. Kennert's stroke, although this information was contained in the records the defense provided to the PSR writer on August 1, 2022. Due to the personal nature of these records, the defense has not filed these documents with the sentencing memorandum; however, if the veracity of Mr. Kennert's claimed health conditions is in question, upon request, the defense is prepared to furnish them to the Court.

[4] See Attachment 3, Nys, et al, *Restrictions of the Mini-Mental State Examination in acute stroke*, Archives of Clinical Neuropsychology 20 (2005) 623-629.

[5] See Attachment 4, Sun, et al, *Post-stroke cognitive impairment: epidemiology, mechanisms and management*, Annals of Translational Medicine 2014; 2(8):80.

[6] See Attachment 4, Sahathevan, R., et al, *Dementia, stroke and vascular risk factors*, International Journal of Stroke, 2011 World Stroke Organization, Vol 7, January 2012, 61-73.

[7] See Attachment 5, Al-Qazzaz, et al, *Cognitive impairment and memory dysfunction after a stroke diagnosis: a post-stroke memory assessment*, Neuropsychiatric Disease and Treatment, 9 September 2014.

longer able to do everyday tasks such as cooking. He has a history of leaving his gas stove on. He also struggles to remember intimate details such as doctor's and mental health provider's names without visual or verbal cues.

A sentence below the guidelines, including a term of home confinement, would be sufficient, but not greater than necessary in this case.

## Conclusion

For the foregoing reasons, Bryan Kennert respectfully requests that the Court exercise leniency by granting a downward variance in this case.

Respectfully submitted,

SHARON A. TUREK
Federal Public Defender

Dated:  September 13, 2022

/s/ Joanna C. Kloet
JOANNA C. KLOET
Assistant Federal Public Defender
50 Louis NW, Suite 300
Grand Rapids, Michigan 49503
(616) 742-7420